# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1652
Filed January 7, 2026

———————————

**In the Interest of K.T. and S.T., Minor Children,**

**D.S., Mother,**
Appellant,

**T.S., Legal Father,**
Appellant,

**K.T., Biological Father,**
Appellant.

———————————

Appeal from the Iowa District Court for Jefferson County,
The Honorable Patrick J. McAvan, Judge.

———————————

**AFFIRMED ON ALL APPEALS**

———————————

Patricia J. Lipski, Washington, attorney for appellant mother.

Patrick C. Brau of Brau Law Office, Mount Pleasant, attorney for appellant legal father.

Larry Brock of Brock Law Office, Washington, attorney for appellant biological father.

Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney General, attorneys for appellee State.

1

Katherine E. Lujan of Washington Law Office, Washington, attorney and guardian ad litem for minor children.

———————————

Considered without oral argument
by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Badding, J.

**BADDING, Judge.**

A mother and two fathers—one biological and one legal—appeal the juvenile court's order terminating parental rights to their two daughters, born in 2020 and 2022. The court found that the girls could not be returned to any of the parents and that termination was in the children's best interests. The mother and legal father challenge those findings on appeal. All three parents contend that the court erred by declining to grant additional time for reunification. Our review is de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).

## I.     Statutory Grounds

The juvenile court terminated each of the parents' rights under Iowa Code section 232.116(1)(f) and (h) (2025).[1] These grounds are nearly identical, except for the age of the children involved and the length of removal. The mother and legal father challenge the final common element of both paragraphs,[2] which require clear and convincing evidence that the

---

[1] The court also terminated the biological father's rights under Iowa Code section 232.116(1)(e) and (*l*). But because he does not contest the statutory grounds for the termination of his parental rights, we confine our analysis to those challenged by the mother and legal father. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (limiting review to the steps challenged by parents on appeal).

[2] The State suggests that the legal father waived any challenge to the statutory grounds for termination by failing to specifically invoke paragraphs "f" or "h" in his petition on appeal. We disagree. Our court has often warned about the risk of waiver for parents who do not sufficiently identify the statutory finding they challenge on appeal. *See, e.g.*, *In re L.A.*, 20 N.W.3d 529, 534 n.2 (Iowa Ct. App. 2025) (en banc). But here, the legal father expressly contests the juvenile court's conclusion "that the children could not be returned," arguing he fulfilled each of the expectations in the department's case plan. The State's failure to address the legal father's statutory-grounds challenge on its merits has deprived us of the benefit of full adversarial briefing.

children cannot be returned to their parents' custody "at the present time." *See* Iowa Code §§ 232.116(1)(f)(4), (h)(4); *see also In re A.B.*, 956 N.W.2d 162, 168 (Iowa 2021) (interpreting the words "present time" to mean "the time of the termination hearing"). After more than three years of services, the court found the "record is clear" that the parents "cannot provide a safe home for the children." We agree.

The Iowa Department of Health and Human Services became involved with the family in April 2022—before the youngest child was born—on a report that the mother and biological father were using drugs in the apartment they shared with the legal father. The mother admitted that she regularly used marijuana to treat her anxiety, even while pregnant. Unsurprisingly, when the youngest child was born in July, her umbilical cord was positive for marijuana. Sweat patches placed on the mother and biological father were also positive for marijuana—and for methamphetamine. Around the same time, the legal father overdosed on his prescribed oxycodone.

The children were adjudicated in need of assistance in October but allowed to remain in the parents' custody until April 2023, when the mother and biological father again tested positive for methamphetamine and marijuana. They made little progress toward reunification over the next year. The State petitioned to terminate all three parents' rights, and a hearing was held in September 2024. The mother and biological father continued to struggle with substance use, employment, and stable housing. They lacked enough money to meet their basic needs, and they relied on friends for shelter and transportation. On top of those issues, the biological father was arrested in July for domestic abuse assault against the mother, resulting in a no-contact order.

The juvenile court found the children could not be safely returned to either of their biological parents. It reached a different conclusion for the legal father, who had been overlooked by the department. A parent to these girls because of his marriage to the mother, *see* Iowa Code § 232.2(45), the legal father lived with the biological parents for most of this case. He testified that he supported the girls before their removal and that he believed they could live with him. Crediting his account, the juvenile court found the legal father was entitled to additional time and services, although it warned he would need "to demonstrate that he can provide for . . . these girls on his own if necessary." The court dismissed the termination petition and granted each of the parents a six-month extension to work toward reunification.

That goal only slipped further away. A series of probation violations landed the biological father in prison,[3] and the mother spent a week in jail after violating her no-contact order with the biological father. The mother continued to test positive for THC, even though she was on probation for operating while intoxicated. She also temporarily revoked the releases that had allowed the department to communicate with her mental-health and substance-use counselors.[4] Meanwhile, neither the mother nor the legal father had a steady source of income. And their visits with the girls remained fully supervised. After a second termination hearing in July 2025, the juvenile court found "that neither child can be returned to the custody of any of their parents at this time."

---

[3] The biological father was still incarcerated when the second termination hearing was held, at which time he conceded that, "given [his] current situation," the children could not be returned to his custody.

[4] The mother later signed a new release that restored the department's access to her mental-health and substance-use information.

Challenging this conclusion, the mother and legal father assert that they demonstrated their commitment to the children by participating in supervised visits and other services in the months after the first termination hearing. They also point out that they secured a suitable home for the girls. Although we applaud these efforts, they are outweighed by other concerns.

Clear and convincing evidence shows that the mother has failed to address the drug problem that required the girls' removal. During the three years that this case was pending, she never provided a test sample that was negative for all substances. Although the mother testified that her positive THC results were from medical cannabis she bought at "a dispensary in Iowa City," she refused to provide further details when questioned at the hearing. Given that lack of candor, as well the mother's attempt to withhold her treatment information from the department, we decline to assume that she uses marijuana in a safe and responsible way. *See In re J.K.*, 495 N.W.2d 108, 112 (Iowa 1993) (drawing an adverse inference about a mother's drug use where she refused to submit to an evaluation and withdrew the release allowing her drug counselor to communicate with her caseworker).

The mother also failed to end her relationship with the biological father after his conviction for domestic abuse assault. Her communication with him—in the form of a sexually explicit video exchange—violated their no-contact order and resulted in her own incarceration. She denied being in a relationship with him at the terminating hearing. But when asked whether she intended to rekindle one, the mother answered, "At this moment, I don't know anything." Her conduct and testimony suggest that she does not understand the risk that domestic violence poses to the children. *See In re T.S.*, 868 N.W.2d 425, 435 (Iowa Ct. App. 2015) (noting a mother's ongoing contact with her abuser in violation of a no-contact order showed she had

"gained very little insight . . . about her domestic violence issues and the dangers they pose to the children").

As for the legal father, his ability to care for the girls on his own was still untested at the time of the second termination hearing. The juvenile court found that despite his stated interest in assuming a custodial role, the legal father had largely chosen to "follow [the mother's] lead." We agree. Although he regularly joined the mother for visits, he declined to schedule his own time with the girls. Only once—during the mother's stint in jail—did he attend an individual visit. At the hearing, the legal father acknowledged that he had not kept up with the girls' medical and educational needs, and he conceded that he had never cared for both children without assistance. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (affirming termination where "after a year of services, the parents were still not in a position to care for [the child] without ongoing [department] involvement"); *A.B.*, 956 N.W.2d at 169 (finding paragraphs "f" and "h" satisfied where, among other things, there was no indication a mother had "ever cared for the children alone overnight"). Although the legal father claimed that he would be able to care for the girls on his own, he was applying for social security disability benefits because of his serious health problems—which included blood cancer and heart issues—and was prescribed more medications than he could remember.

Despite six months of additional services, neither the mother nor the legal father seized the chance to prove their parenting abilities. Their window of time was not unlimited. *See A.B.*, 956 N.W.2d at 169 (explaining that by enacting section 232.116(1)(f) and (h), our "legislature has established a limited time frame for parents to demonstrate their ability to be parents" (citation omitted)). We find clear and convincing evidence that the

children could not be safely returned to the mother or legal father's custody at the time of the hearing. The State proved grounds for termination under section 232.116(1)(f) and (h).

## II. Best Interests

The mother and legal father also challenge the juvenile court's finding that termination of parental rights was in the girls' best interests. Even where a statutory ground exists, we only affirm termination when that outcome serves the best interests of the child. *In re Z.P.*, 948 N.W.2d 518, 525 (Iowa 2020). In examining that question, we give "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). A child's integration with their foster family is another important factor. *See id.* § 232.116(2)(b).

At the time of the termination hearing, the children had been removed from their parents for twenty-seven months. They spent most of that time in a placement with the mother's cousin. Both girls were thriving under her care. The older child had recently graduated from preschool, while the younger child had completed speech therapy and was rapidly expanding her vocabulary. According to the guardian ad litem, the girls were bonded with the cousin, who was prepared to adopt them in the event of termination.

The mother contends that termination is not in the girls' best interests due to the strength of their parent-child bond and other available permanency options, such as transferring guardianship to the cousin.[5] We are

---

[5] Blurring the lines of our familiar three-step analysis, the mother also suggests her bond with the girls supports a "permissive exception[] to termination." A passing reference to Iowa Code section 232.116(3)(c) is typically insufficient to merit a separate permissive-exception analysis. *L.A.*, 20 N.W.3d at 534 n.2. But to avoid any doubt, we

unpersuaded. Although "the parent-child bond is a relevant consideration in the best-interests analysis," *In re L.A.*, 20 N.W.3d 529, 535 (Iowa Ct. App. 2025), it is not controlling here. The girls also share a bond with the maternal cousin, who has been their primary caretaker for most of their young lives. *See id.* at 535 (finding termination was in a child's best interests, notwithstanding a father's professed bond, where the young child was "more bonded with [her] current caretakers"). And as for a guardianship, our supreme court has made it clear that a "guardianship is not a legally preferable alternative to termination," especially for young children. *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018).

We see no signs that the girls' short- or long-term needs would be better served by preserving the parents' rights. None of the parents provided financial support for the girls during their placement with the cousin. And they were mostly uninvolved in the children's medical and educational decisions. The cousin also testified that the girls showed signs of emotional distress on nights before and after visitation. As the juvenile court put it, these girls are "crying out for permanency." We will not extend their time in limbo. Accounting for all the factors set out in section 232.116(2), we find that termination of parental rights is in their best interests.

## III. Additional Time

Lastly, all three parents claim that the juvenile court should have allowed them another six months to work toward reunification rather than terminating their parental rights. *See* Iowa Code §§ 232.117(5),

---

find the mother has not carried her burden to show that termination would be detrimental to the children because of the closeness of her relationship with them. *See A.S.*, 906 N.W.2d at 476 (explaining the burden is on the parent to establish a permissive exception to termination).

232.104(2)(b).  To grant that relief, the court must find that "the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (quoting Iowa Code § 232.104(2)(b)).  It is the parents' burden to make that showing.  *Id.*

The mother and legal father failed to establish that additional time would have fixed the problems that prevented the girls' return in July 2025.  In the months after the first termination hearing, the mother continued to prioritize marijuana and an unhealthy relationship with the biological father.  The legal father took a passenger-seat approach to parenting.  Given this record, we cannot find that a second second-chance would result in a different outcome for the mother or legal father.  The girls have waited for permanency much longer than required by section 232.116(1)(f) and (h).  At this point, the "termination proceedings must be viewed with a sense of urgency."  *A.B.*, 956 N.W.2d at 169 (citation omitted).

As for the biological father—who challenges the denial of additional time as his only claim of error—our conclusion is no different.  He argues that an extension is warranted because he was released from prison after the termination hearing.  That development was not known by the juvenile court at the time of termination, and it is not a part of our record on appeal.  But even if we could properly consider it, the biological father's incarceration was just one reason why the children could not be returned to his custody.  Equally concerning are his failures to comply with his probation requirements, his violation of the no-contact order, and his failure during the years this case was open to meaningfully engage in substance-use treatment.  With that performance, the juvenile court properly denied the biological father's request for more time.

**AFFIRMED ON ALL APPEALS.**